The Reverend Timothy **MOCKAITIS** and The Most Reverend Francis E. George, O.M.I., Plaintiffs,

v.

F. Douglass **HARCLEROAD**, The Honorable Jack A. Billings, The Honorable Kip W. Leonard, Conan Wayne Hale, Jonathan Wayne Susbauer, and John Does Nos. 1–5, Defendants.

Civ. No. 96–913–PA.

United States District Court, D. Oregon.

Aug. 15, 1996.

---

Thomas V. Dulcich, Bradley I. Nye, Schwabe, Williamson & Wyatt, Portland, OR, for Plaintiffs.

Gregory A. Chaimov, Assistant Attorney General, Department of Justice, Salem, OR, for Harcleroad, Billings and Leonard.

Terri Wood, Law Offices of Terri Wood, PC, Eugene, OR, for Conan Wayne Hale.

Michael V. Phillips, Eugene, OR, for Wayne Susbauer.

PANNER, District Judge.

Plaintiffs Timothy Mockaitis, a Roman Catholic priest, and the Most Reverend Francis George, Archbishop of the Archdiocese of Portland, bring this action against defendants Lane County District Attorney Douglass Harcleroad, Lane County Circuit Court Judges Jack Billings and Kip Leonard,

and triple murder suspects Conan Wayne Hale and Jonathan Wayne Susbauer. The case concerns Harcleroad's unfortunate decision to tape and transcribe a conversation between Hale and Mockaitis while Hale was an inmate at the Lane County jail.

Plaintiffs raise five claims: (1) violation of their First Amendment rights to the free exercise of religion; (2) violation of their Fourth Amendment rights to be free from unreasonable searches and seizures; (3) violation of their rights under the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb–2000bb–4; (4) violation of the Wiretapping Act, 18 U.S.C. §§ 2510–2520; and (5) violation of Article I, Sections 2 and 3 of the Oregon Constitution. As relief, plaintiffs seek immediate destruction of the tape and any transcripts.[1]

The parties presented the case on stipulated facts and briefed and argued the legal issues. I abstain from deciding the merits of the claims and dismiss the case. *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

## BACKGROUND

The stipulated facts are attached to this Opinion as Appendix A. Additionally, in an earlier hearing I found that "Mockaitis intended to give the Sacrament [of the Penance] and that defendant Hale was not a Catholic but had been baptized and that Hale intended to make a confession and participate in a [S]acrament of the [P]enance." August 6, 1996 Minute Order (Docket Entry # 35).

At final argument, Hale objected to submitting the case on the stipulated facts because he wanted a finding that the tape and transcript are material, exculpatory evidence in his state criminal proceedings. I assume that the tape and transcript would be helpful or harmful to Hale or Susbauer and there is no need to make a finding of fact on that issue. With his objection noted for the record, Hale agreed to proceed to a final decision on the stipulated facts.

## DISCUSSION

### I. The Decision to Tape

Harcleroad's decision to tape the intended confession[2] has understandably triggered a fury of criticism. *See, e.g.,* Harvey A. Silverglate, *Secret as A Confession?,* Nat'l L.J., July 1, 1996, at A17 (noting "protests from all sides" including the American Civil Liberties Union and the Rutherford Institute, a private conservative religious liberty organization); Bob Ewegen, *A Bayonet in the Confessional,* Denver Post, July 22, 1996, at B7 (condemning Harcleroad's decision to tape); Laurie Goodstein, *Taped Confession to Priest Raises Ire,* Houston Chronicle, May 11, 1996, at 23 (noting Archdiocese's "uproar" over the taping); Dana Tims, *Parishoners Back Priest in Jailhouse Confession,* Oregonian, May 13, 1996, at B1 (noting standing ovation for Mockaitis by his parishioners at Sunday Mass and noting varied expressions of outrage); *Vatican Enters Debate About Lane County Jailhouse Taping,* Oregonian, May 25, 1996, at D1 (reporting that Vatican's Secretary of State wrote to United States Ambassador deploring the recording of the confession).

■ Plaintiffs are justifiably outraged by Harcleroad's actions. Harcleroad himself admits that the taping was wrong: "There are some things which are legal and ethical but are simply not right. I have concluded that tape recording confidential clergy-penitent communications falls within the zone of societally unacceptable conduct." Deft.Exh. 1 (May 22, 1996 Statement of Doug Harcleroad). I agree with Harcleroad. Knowingly taping an intended confession between a penitent and a priest is inappropriate and should not have occurred.

1. Harcleroad has already agreed to provide most of plaintiffs' other requested relief and has agreed to ask Lane County to destroy the tape and transcripts when criminal proceedings involving Hale and Susbauer are complete. Stip. Facts 46, 51, 64–67.

2. Because I have not listened to the tape, I cannot make a finding that the conversation between Hale and Mockaitis was a "confession" or Sacrament of Penance under Roman Catholic law and doctrine. Based on my findings of fact, I refer to the conversation as an "intended confession."

Plaintiffs have done all they can to protect their Sacraments. In particular, Mockaitis has maintained his vow to keep Hale's communication confidential. He has not violated the Seal of the Confessional.

## II. *Younger* Applies

■ There are three requirements for the invocation of *Younger* abstention: (1) ongoing state proceedings; (2) implication of an important state interest in the state proceedings; and (3) an adequate opportunity to raise federal questions in those proceedings. *Citizens for a Better Environment—Calif. v. Union Oil Co. of Calif.*, No. 95–15139, 1996 WL 395634 at *8 (9th Cir. July 16, 1996). There is no dispute that the first two elements are met.

Plaintiffs are not parties to the pending criminal prosecutions against Hale and Susbauer and their apparent inability to adjudicate their federal claims in those state proceedings would ordinarily make *Younger* inapplicable. *See Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982) (pertinent inquiry is whether state proceedings afford an adequate opportunity to raise constitutional claims); *Benavidez v. Eu*, 34 F.3d 825, 832 (9th Cir.1994) (*Younger* usually applied to parties actually involved in state litigation) (citing *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 927–29, 95 S.Ct. 2561, 2565–67, 45 L.Ed.2d 648 (1975)). That is why I initially rejected Susbauer's *Younger* abstention argument. However, now that the facts have been developed, I conclude that *Younger* applies either because plaintiffs can present their claims in state court or because this is an extraordinary case requiring abstention despite plaintiffs' non-party status in the criminal prosecutions.

### A. Opportunity to Raise Issues in State Court

■ Plaintiffs attempted to intervene in the criminal proceedings but they have not petitioned for a writ of mandamus seeking either review of Judge Billings's order preserving the tape or an order requiring Judge Billings to reduce his June 13, 1996 letter to an appealable order. Mandamus relief may enable plaintiffs to raise their federal claims in state court. *Cf. Radio and Television News Ass'n of S. Calif. v. United States Dist. Court*, 781 F.2d 1443, 1446 (9th Cir.1986) (on writ of mandamus, court decided merits of news organization's First Amendment challenge to district court order restraining criminal defendant's trial counsel from making extrajudicial statements to media); *In re Greensboro News Co.*, 727 F.2d 1320, 1321 (4th Cir.) (petition for writ of mandamus proper vehicle for reviewing news organization's constitutional challenge to order excluding public from voir dire), *cert. denied sub nom., Greensboro News Co. v. Flannery*, 469 U.S. 829, 105 S.Ct. 114, 83 L.Ed.2d 57 (1984); *State v. Pelham*, 136 Or.App. 336, 342, 901 P.2d 972, 975 (1995) (rulings made during proceedings ancillary to criminal trial may, under certain circumstances, be challenged by petitioning for writ of mandamus), *review denied*, 323 Or. 264, 916 P.2d 312 (1996).

### B. Abstention Required

■ Even if plaintiffs cannot seek mandamus review of Judge Billings's actions, the unique facts here require abstention under *Younger* principles. Because plaintiffs seek suppression of evidence and a declaration that their constitutional rights were violated, the relief they request places them in the role of a typical *Younger* plaintiff facing criminal charges in state court.

In such cases, federal courts should abstain from suppressing allegedly illegally seized evidence in a state court prosecution. *Perez v. Ledesma*, 401 U.S. 82, 84–85, 91 S.Ct. 674, 676–77, 27 L.Ed.2d 701 (1971) (issued same day as *Younger*).

> It is difficult to imagine a more disruptive interference with the operation of the state criminal process short of an injunction against all state proceedings.... [S]uch federal interference with a state prosecution is improper. The ... admissibility of evidence in state criminal prosecutions [is] ordinarily [a] matter[ ] to be resolved by state tribunals[.]

*Id.* at 84, 91 S.Ct. at 676; *see also Dubinka v. Judges of the Superior Court of Calif.*, 23

F.3d 218, 223 (9th Cir.1994) (citing *Perez* and requiring abstention when a federal plaintiff seeks federal intervention, before a state criminal trial, to resolve isolated and discrete trial issues such as admissibility of evidence).

Here, granting plaintiffs' requested relief would be no less offensive to state sovereignty and the notions of "Our Federalism," *see Younger*, 401 U.S. at 44–45, 91 S.Ct. at 750–51, than it would be in the ordinary *Younger* scenario. Furthermore, because plaintiffs seek destruction of the tape and transcript rather than just its suppression, the interference in state criminal proceedings would be even more offensive.

The fact that Hale and Susbauer, the defendants in the state court criminal proceedings, oppose destruction of the tape and transcript in this court, makes this case atypical. Because plaintiffs seek destruction of the tape while Hale and Susbauer seek its preservation, no middle ground is possible. And, not only is plaintiffs' request contrary to Hale's and Susbauer's stated interests, the tape is evidence they may well be entitled to receive under state law. *See* ORS 135.815 (generally providing for disclosure to defense); ORS 135.815(2) (all recorded statements of a defendant, regardless of whether the state intends to use them at trial, must be disclosed to the defense as soon as practical after the filing of an indictment); *Brady v. Maryland*, 373 U.S. 83, 87–88, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963) (prosecutor constitutionally obligated to provide material, exculpatory information to defendant); *State v. Kersting*, 50 Or.App. 461, 474, 623 P.2d 1095, 1103 (1981) (state must disclose material, favorable evidence and "[t]he duty to disclose includes a duty to preserve evidence prior to trial."), *aff'd*, 292 Or. 350, 638 P.2d 1145 (1982).

In summary, even assuming that plaintiffs' rights were violated, I abstain because granting plaintiffs' requested relief would " 'have the effect of a federal court telling a state court how to run an ongoing criminal prosecution' and [ ] such relief 'would have the intrusive impact on the state proceeding that *Younger* and its progeny abhorred.' " *The News–Journal Corp. v. Foxman*, 939 F.2d 1499, 1508 (11th Cir.1991) (quoting *Williams*

*v. Rubiera*, 539 F.2d 470, 473, 474 (5th Cir. 1976), *cert. denied*, 431 U.S. 931, 97 S.Ct. 2636, 53 L.Ed.2d 246 (1977)).

### III. Balancing the Equities

■ Hale's and Susbauer's rights to a fair trial outweigh plaintiffs' rights to free exercise of religion and freedom from unconstitutional searches and seizures. "[W]hen First Amendment claims impinge upon the Sixth Amendment right to a trial by an impartial jury, asserted First Amendment interests must yield to the 'most fundamental of all freedoms,' the right to a fair trial for the accused." *Foxman*, 939 F.2d at 1512 (quoting *Estes v. Texas*, 381 U.S. 532, 540, 85 S.Ct. 1628, 1631–32, 14 L.Ed.2d 543 (1965)); *accord United States v. LaRouche Campaign*, 841 F.2d 1176, 1182 (1st Cir.1988) (criminal defendant's Sixth Amendment rights outweigh television network's First Amendment rights); *La Rocca v. Lane*, 37 N.Y.2d 575, 584, 338 N.E.2d 606, 613, 376 N.Y.S.2d 93, 102 (1975) (interest in according criminal defendant and state a fair trial outweighed defendant's attorney's free exercise right to wear clerical collar during trial), *cert. denied*, 424 U.S. 968, 96 S.Ct. 1464, 47 L.Ed.2d 734 (1976). Although *Foxman* concerned free speech as opposed to free exercise or Fourth Amendment rights, the rights are comparable when they conflict with the Sixth Amendment right to a fair trial.

The equities in Hale's and Susbauer's favor are especially strong because they are facing the death penalty with a "heightened standard" evidentiary sentencing process. *See Simmons v. South Carolina*, 512 U.S. 154, ——, 114 S.Ct. 2187, 2198, 129 L.Ed.2d 133 (1994) (Souter, J. concurring) (Eighth Amendment requires "heightened standard 'for reliability in the determination that death is the appropriate punishment in a specific case.' ") (quoting *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976)).

### IV. Plaintiffs' Arguments

#### A. Wiretapping Act

■ Plaintiffs argue that the tape violates the Wiretapping Act and cannot be intro-

duced as evidence in the criminal trial. 18 U.S.C. § 2515. Assuming Harcleroad violated the Wiretapping Act, section 2515 probably does not require suppression or destruction of the tape.

First, plaintiffs cite no cases in which the section 2515 exclusionary rule prevented a surreptitiously taped *defendant* from introducing the tape. In fact, cases suggest that the section 2515 exclusionary rule is meant to deny government officials the right to use illegally obtained evidence. *In re Proceedings to Enforce Grand Jury Subpoenas*, 430 F.Supp. 1071, 1072–73 (E.D.Pa.1977).

Even if the tape may not be used as direct evidence, it may be used for impeachment. *United States v. Echavarria–Olarte*, 904 F.2d 1391, 1397 (9th Cir.1990). Additionally, plaintiffs cite no cases in which the section 2515 exclusionary rule prevented the use of illegally taped conversations in the sentencing phase of a death penalty case. Finally, plaintiffs may not have standing to seek suppression of the tape. *See In re Vigorito*, 499 F.2d 1351 (2d Cir.) (no standing for persons, whose conversations were overheard pursuant to court-ordered electronic surveillance, to seek section 2515 exclusion when they were not criminal defendants or grand jury witnesses), *cert. denied*, 419 U.S. 1056, 95 S.Ct. 640, 42 L.Ed.2d 654 (1974).

Because there are several possible exceptions to section 2515's mandate of exclusion, I reject plaintiff's argument that section 2515 requires destruction of the tape. The issue is more properly addressed to the state court trial judge.

### B. Other Arguments

 Plaintiffs argue that no competing rights prohibit destruction of the tape and transcript. I disagree. Although Oregon law protects clergy-penitent communications, the penitent possesses the privilege. ORS 40.260 (Or.Evid.Code 506); *State v. Cox*, 87 Or.App. 443, 448, 742 P.2d 694, 696 (1987) (the privilege to disclose or keep the confessional confidential "belongs to the penitent"). Plaintiffs' rights, assuming ORS 40.260 protects them, must yield when Hale himself seeks to preserve the intended confession.

Plaintiffs also maintain that the rules of evidence would prevent Hale or Susbauer from using the tape or transcript in their criminal trials. This argument demonstrates just how inappropriate a federal court order requiring destruction of the tape would be. It is precisely these evidentiary questions and arguments that the state trial court judge should resolve. I have complete confidence in the state judge's ability to ensure a fair trial.

Plaintiffs further suggest that Hale's and Susbauer's rights will be protected because the Oregon and federal courts on direct appeal and post-conviction review can determine whether Hale and Susbauer received a fair trial. However, immediate destruction of the tape and transcript would prevent those courts from making that determination. Plaintiffs' argument is unsupportable.

Finally, because I am abstaining under *Younger*, plaintiffs' request for declaratory relief is barred. *Hirsh v. Justices of the Supreme Court of Calif.*, 67 F.3d 708, 712 (9th Cir.1995) (citing *Samuels v. Mackell*, 401 U.S. 66, 73, 91 S.Ct. 764, 768, 27 L.Ed.2d 688 (1971)).

### CONCLUSION

Plaintiffs' claims are dismissed.

### APPENDIX A

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF OREGON

The Reverend Timothy Mockaitis, and The Most Reverend Francis E. George, O.M.I., Plaintiffs,

v.

F. Douglass Harcleroad, The Honorable Jack A. Billings, The Honorable Kip W. Leonard, Conan Wayne Hale, Jonathan Wayne Susbauer, and John Does Nos. 1–5, Defendants.

Civil No. 96–00913–PA

### STIPULATED FACTS

I. AGREED FACTS [THOSE AS TO WHICH RELEVANCE IS DISPUTED ARE MARKED WITH AN ASTERISK]

1. The Reverend Timothy Mockaitis ("Fr. Mockaitis") is an ordained priest of the Roman Catholic Church, serving in the Archdiocese of Portland in Oregon ("Archdiocese").

2. Fr. Mockaitis currently serves as Pastor of St. Paul's Parish in Eugene, Oregon.

3. The Most Reverend Francis E. George, O.M.I. ("Archbishop George") is an ordained priest of the Roman Catholic Church and the Archbishop of the Archdiocese of Portland in Oregon.

4. Under the law of the Roman Catholic Church ("Canon Law"), Archbishop Francis George is the representative of Christ, a successor to the apostles and the chief Catholic religious official of the Church in Western Oregon.

5. Under Canon Law and religious doctrine of the Roman Catholic Church, Archbishop George is responsible for all aspects of the practice of the Roman Catholic religious faith in western Oregon.

6. Under Canon Law and religious doctrine of the Roman Catholic Church, Archbishop George is responsible for insuring that his priests and people have proper access to the institutions and Sacraments intended to foster their spiritual life.

7. Under Canon Law and religious doctrine of the Roman Catholic Church, Archbishop George is responsible for insuring the proper celebration of the Sacraments in Western Oregon.

8. Defendant F. Douglass Harcleroad ("Harcleroad") is the District Attorney for Lane County, Oregon. Harcleroad is ultimately responsible for the acts of persons in his office and prosecution of crimes within Lane County, Oregon.

9. Defendant the Honorable Kip W. Leonard ("Judge Leonard") is the Presiding Judge of the Lane County Circuit Court.

10. Defendant the Honorable Jack A. Billings ("Judge Billings") is a Lane County Circuit Court Judge.

11. Conan Wayne Hale ("Hale") is an individual, residing at all material times in the Lane County Jail. Hale is a suspect in numerous capital and non-capital crimes, some of which are alleged to have been committed together with defendant Jonathan Wayne Susbauer.

12. Jonathan Wayne Susbauer ("Susbauer") is an individual, presently residing in the Lane County Jail as a suspect in numerous capital and non-capital crimes, some of which are alleged to have been committed together with defendant Hale.

13. On or around April 18, 1996, Hale requested to meet with a priest of the Roman Catholic faith to receive the Sacrament of Penance (also called the Sacrament of Reconciliation or "confession").

14. The Sacrament of Penance is one of the seven (7) Sacraments of the Roman Catholic Church.

15. A Sacrament is for Catholics an outward sign of the spiritual grace of God.

16. Under religious doctrine of the Roman Catholic Church, the Sacraments are the principal means by which the Catholic faith is expressed and strengthened, worship is rendered to God, and the sanctification of humankind is effected.

17. The Sacrament of Penance is an ancient religious practice of the Church, having its basis in the New Testament scriptures of the Bible.

18. Under religious doctrine of the Roman Catholic Church, in the Sacrament of Penance the priest functions in the person of Christ and under Church doctrine divine forgiveness is mediated sacramentally through the Church.

19. Under religious doctrine of the Roman Catholic Church and Canon Law, the contents of communication between priest and penitent are absolutely secret and confidential.

20. No priest of the Roman Catholic Church may divulge anything said by the penitent during the Sacrament of Penance upon pain of excommunication, but no similar doctrine constrains the penitent from disclosing anything said during the Sacrament of Penance.

21. Under Canon Law and religious doctrine of the Roman Catholic Church, the

"Seal of the Confessional" is the strict obligation to maintain silence concerning that which is disclosed in a sacramental forum. The obligation of confidentiality arises once the confession is commenced, even if the confession is sacrilegious (without repentance) or if absolution (forgiveness of sins) is refused or deferred. No exception of the seal is made, even for the common welfare; in any case of doubt the confessor must favor the seal. The "Seal of the Confessional," is of utmost importance to the religious practices and beliefs of Roman Catholics.

22. Subsequent to the publication of the Code of Canon Laws, the Congregation for the Doctrine of the Faith of the Roman Catholic Church in Rome provided for an additional penalty. A decree was issued in 1988 automatically excommunicating anyone who recorded on an instrument or otherwise published anything, whether true or false, said in sacramental confession. (AAS 80 (1988) 1367). A copy of the Latin language issue of this decree is appended as Exhibit AA.

23. While under Canon Law the confessor priest is always bound by the seal of the confessional, the penitent is not. The penitent may talk about what occurred within the sacramental forum. However, the penitent may not release the confessor from his incapability under Canon Law to testify in church and civil court.

24. Under Canon Law of the Roman Catholic Church, it is not necessary that a penitent be a member of the Roman Catholic faith for the seal of the confessional to apply.

25. On or about April 22, 1996, Fr. Mockaitis came to the Lane County Jail with the express purpose of administering the Sacrament of Penance to Hale.

*26. Upon appearing at the visitors' entrance to the visiting area of the Lane County Jail, Fr. Mockaitis signed in on a book provided for that purpose.

*27. Fr. Mockaitis was wearing the Roman collar which signifies his vocation as a Roman Catholic priest.

*28. Fr. Mockaitis was known to personnel at the Lane County Jail because of his prior visits to the Jail for purposes of administering the Sacrament of Penance at the request of other inmates in the Lane County Jail.

*29. Before Fr. Mockaitis was first allowed to conduct such religious work at the Lane County Jail, he was required to furnish to members of the Lane County Sheriff's Department at the Lane County Jail a written proof of his ordination as a Roman Catholic priest, which he did, as well as providing photograph identification.

30. On or about April 22, 1996, employees of the Lane County Sheriff's Department knew that Fr. Mockaitis was a validly ordained Roman Catholic priest who came to the Lane County Jail with the specific purpose of administering the Sacrament of Penance to Hale.

*31. On or about April 22, 1996, the sign-in area for visitors at the Lane County Jail contained a sign bearing several, numbered instructions as posted orders for visitors made by the Lane County Sheriff's Department. Among those posted orders was a statement by the Lane County Sheriff's Department that "no recording equipment is allowed" in the Jail's visiting area.

*32. Neither the Lane County Sheriff's office nor any of the posted orders in the Jail informed Fr. Mockaitis that his administration of the Sacrament or any other communication with Mr. Hale would be monitored, intercepted or recorded.

*33. Defendant Harcleroad and his agents in the Lane County District Attorney's office were familiar with the physical layout, the posted orders, and the usual procedures of the Lane County Jail.

34. Fr. Mockaitis communicated with defendant Hale via a telephonic device that allows inmates to converse with visitors despite the presence of a glass partition between them.

35. Prior to communicating with Hale, Fr. Mockaitis believed the communication would be confidential and was not aware it would not be confidential.

36. Unknown to Fr. Mockaitis, his communication with Hale was intercepted and taped on audiocassette by the officers or employees of the Lane County Sheriff's Department, as requested by Harcleroad through assistant district attorneys.

\*37. Fr. Mockaitis had administered the Sacrament of Penance to inmates at the Lane County Jail on occasions prior to April 22, 1996 and to his knowledge, none of those communications were intercepted or recorded, and he was not aware of any practice to record communications with inmates.

38. If Fr. Mockaitis had knowledge his communication with Hale was to be recorded, he would not have come to the Lane County Jail in response to the request to administer the Sacrament of Penance.

39. Fr. Mockaitis was unaware his communication with Hale had been monitored, intercepted or recorded until he was contacted subsequently by a reporter from the Eugene *Register–Guard.*

\*40. No court order, search warrant, order pursuant to O.R.S. 133.724 or O.R.S. 133.726, or any other court authorization, was obtained prior to the monitoring, interception and recording of the communication between Fr. Mockaitis and Hale.

41. On or around April 23, 1996, the Lane County District Attorney's Office assisted members of the Lane County Sheriff's Department in obtaining a search warrant signed by Judge Hodges allowing its employees to search the audiocassette tape and seize the statements on the tape.

\*42. The affidavit used to obtain the search warrant, prepared with the assistance of the Lane County District Attorney's office, stated in part:

> I know from my experience and training that the Catholic confession is an integral part of Catholicism. It is a sacrament. The basic tenet of confession is that a person is absolved of his or her wrongdoing upon making a full and complete acknowledgement of what that wrongdoing is. After the person gives that acknowledgment of what he or she has done wrong, the priest prescribes a penance.

Upon performance of the penance, a person is absolved of his or her sins.

43. A true copy of the Affidavit supporting issuance of the search warrant and the search warrant is appended hereto as Exhibit BB.

44. On or after April 23, 1996, employees of the District Attorney's office and a deputy sheriff intentionally listened to the contents of the tape.

45. The tape was transcribed into a typed document.

46. Joseph M. Kosydar and Patricia Perlow, who are Deputy District Attorneys in Lane County, and Jeffrey Carley and Brandy Selby who are employees of Lane County, have some or full knowledge of the contents of the tape. Terri Wood and her co-counsel Steve Miller have listened to the tape.

47. Defendants Harcleroad, Billings and Leonard were at all times material acting under color of state law.

48. On or about May 7, 1996, plaintiffs' representatives requested that Harcleroad destroy the tape and all copies.

\*49. The predecessor of plaintiff Archbishop George formalized plaintiff's request to destroy the tape by a letter dated May 21, 1996, a copy of which is attached as Exhibit CC.

50. On or around May 22, 1996, the tape of the communication and a transcript of the tape were delivered by agents of Harcleroad to Judge Leonard.

51. On May 22, 1996, Harcleroad filed a motion in the Lane County Circuit Court, for an order sealing the tape and transcript and prohibiting those with knowledge of the tape or transcript's contents from disclosing those contents. On the same day, Judge Leonard signed the requested order. The order was captioned "In the Matter of A TAPE RECORDING OF CONAN WAYNE HALE MADE AT THE LANE COUNTY JAIL ON APRIL 22, 1996," and a copy of the Amended Order is appended hereto as Exhibit DD.

\*52. On June 12, 1996, at 11:42 a.m., plaintiffs filed in Lane County Circuit Court a petition and motion requesting an order to destroy the tape and transcript. The peti-

tion and motion was captioned "In the Matter of A TAPE RECORDING OF CONAN WAYNE HALE MADE AT THE LANE COUNTY JAIL ON APRIL 22, 1996."

*53. The petition and supporting documents were taken from the filing clerk by Judge Leonard and were subsequently transferred to Judge Billings.

*54. A copy of the petition and the motion and supporting affidavits are attached hereto marked as Exhibits EE, FF, and GG.

*55. By letter dated June 13, 1996, Judge Billings returned to plaintiffs' counsel the petition and motion and all supporting materials plaintiffs had filed the previous day.

*56. In his letter of June 13, 1996, Judge Billings wrote that plaintiffs had no standing and that plaintiffs' petition did not present a "justiciable controversy." The letter also advised that "except upon further motion of one or both of the parties, or upon directive of some higher court, this Court will not consider, under any circumstances, the action which your clients desire." A copy of the June 13, 1996, letter from Judge Billings is attached hereto as Exhibit HH.

57. On June 13, 1996, Hale moved to preserve the tape and transcript as evidence, and Judge Billings signed an order granting that motion. A copy of that June 13, 1996, order is attached hereto as Exhibit II.

58. Under the religious doctrine of the Roman Catholic Church, the continued existence of a tape and transcript of a communication under the seal of the confessional would violate the sanctity of the seal of the confessional.

59. Hale was served with an Indictment in Lane County Circuit Court for the State of Oregon, Case No. 10–96–04830, on May 30, 1996, prior to the filing of plaintiffs' Complaint. The Indictment charged Hale with 22 counts of aggravated murder and other alleged crimes.

60. Defendant Hale is represented by counsel in the aforesaid aggravated murder prosecution. On 13 June 1996, Hale's counsel moved to preserve as evidence during pendency of his prosecution the tape and transcript which are the subject of plaintiffs' Complaint. Defendant Jack A. Billings, Circuit Court Judge, granted said motion.

61. Hale pled not guilty to the crimes alleged in the Indictment, and demanded trial by jury.

62. ORS 163.150 includes death as a possible sentence for a person convicted of aggravated murder, as that crime is alleged against defendant Hale.

63. The State of Oregon, through defendant F. Douglass Harcleroad, has announced its intent to seek the death penalty against defendant Hale.

64. Defendant Harcleroad agrees not to introduce the tape or transcript of the communication (or the fact that a communication between Fr. Mockaitis and defendant Hale occurred) in the trial of defendant Hale or defendant Susbauer, except to rebut allegations made by defendant Hale or defendant Susbauer about the conversation, the tape or its contents.

65. Defendant Harcleroad has not used and agrees not to use the tape or transcript of the communication between Fr. Mockaitis and defendant Hale to develop evidence against defendant Hale or defendant Susbauer.

66. Defendant Harcleroad will ask the Lane County Circuit Court for permission to destroy the tape and transcript upon the conclusion of all proceedings related to the prosecution, conviction, or sentence of defendants Hale and Susbauer.

67. Prior to the commencement of this action, Lane County agreed not to intercept or tape conversations between Catholic clergy and inmates at the Lane County Jail.

68. Defendant Susbauer is accused in Lane County Circuit Court Case No. 10–96–00479 of a number of crimes, including three separate offenses of aggravated murder. The punishment for aggravated murder includes death by legal injection. Defendant Susbauer has plead not guilty to the allegations of that indictment and awaits trial.

69. In recording the communication between Defendant Hale and Fr. Mockaitis, jail

personnel claim to have been acting pursuant to ORS 165.540(2)(a).

*70. As long as any copy of a tape or transcript of his communication with Conan Wayne Hale on April 22, 1996, remains in existence, Fr. Mockaitis feels uncomfortable with administering the Sacrament of Penance in the Lane County Jail.

*71. Fr. Mockaitis' regular duties as a priest require him to respond to people who ask him to administer the Sacrament of Penance, even outside his parish church building. His ability to respond is especially important for people who may be in a serious state of sin and therefore in particular need of the Sacrament of Penance.

*72.

73. The facts stated in Paragraphs 70–72 apply to other priests of the Roman Catholic religious faith for which Archbishop George has responsibility, in addition to Fr. Mockaitis.

74.

75. Prior to communicating with Hale on April 22, 1996, based upon the facts of which he had knowledge, Fr. Mockaitis had no reason to believe his communication with Hale would not be confidential.

76. Inmates at the Lane County jail communicate with visitors (except for legal counsel) through an intercom system. An inmate sits on one of six stools separated from the visitors' area by a waist-height partition topped by a pane of glass. Each visiting room accommodates six inmates' conversations with visitors.

77. To preserve institutional security, Lane County monitors, on an inmate by inmate basis, the intercom conversations of inmates charged with serious crimes.

78. The Lane County Sheriff's Department monitored defendant Hale's conversations with approximately 90% of his visitors except Hale's legal counsel.

79. The telephonic device described in Paragraph 34 cannot be used to place calls to or receive calls from persons outside the jail.

80. Hale informed others that his jailers were monitoring his conversations and communicated with visitors in writing when he did not want jailers to monitor his communications.

81.

82. On June 13, 1996, Hale's defense counsel moved to preserve as evidence during the pendency of his prosecution the tape and transcript which are the subject of plaintiffs' Complaint.

83. On July 31, 1996, Judge Billings heard argument on a defense motion for discovery which included, *inter alia*, a request for defense counsel to listen to the taped conversation between Hale and Fr. Mockaitis. The State did not oppose the motion. Judge Billings granted that portion of the motion, and further ordered that Hale's counsel not discuss the contents of the tape recording with anyone except themselves and Hale. Defense counsel listened to the tape on August 1, 1996.

84.

85.

86.

87.

88.

89.

IT IS SO STIPULATED.

SCHWABE, WILLIAMSON & WYATT

Dated: 8–12–96

By: [Signature]
Thomas V. Dulcich, OSB# 80210
Bradley I. Nye, OSB# 92604
John R. Faust, Jr., OSB# 58024
Of Attorneys for Plaintiffs

ATTORNEY GENERAL FOR THE STATE OF OREGON, Theodore R. Kulongoski

By: /s/ Gregory A. Chaimov
Gregory A. Chaimov,
OSB# 82218
Of Attorneys for Defendants Harcleroad, Billings and Leonard

[Signature]
Terri Wood, OSB# 88332
Attorney for Defendant Conan Wayne Hale

/s/ Michael Phillips
Michael V. Phillips, OSB# 69137
Attorney for Defendant Jonathan Wayne Susbauer

# ACTA CONGREGATIONUM

## CONGREGATIO PRO DOCTRINA FIDEI

### URBIS ET ORBIS

### DECRETUM

quo, ad Poenitentiae sacramentum tuendum, excommunicatio latae sententiae illi quicumque ea quae a confessario et a poenitente dicuntur vel per instrumenta technica captat vel per communicationis socialis instrumenta evulgat, infertur.

Congregatio pro Doctrina Fidei, ad sanctitatem sacramenti Poenitentiae tuendam et ad eiusdem ministrorum ac christifidelium iura munienda quae ad sacramentale sigillum attinent et ad alia secreta cum Confessione connexa, vigore specialis facultatis sibi a Suprema Ecclesiae auctoritate tributae (can. 30), decrevit:

Firmo praescripto can. 1388, quicumque quovis technico instrumento ea quae in Sacramentali Confessione, vera vel ficta, a se vel ab alio peracta, a confessario vel a poenitente dicuntur, captat, aut communicationis socialis instrumentis evulgat, in excommunicationem latae sententiae incurrit.

Decretum hoc vigere incipit a die promulgationis.

IOSEPHUS Card. RATZINGER, *Praefectus*

L. ✠ S.

Albertus Bovone, Archiep. tit. Caesarien, in Numidia, *a Secretis*

In Congr. pro Doctrina Fidei tab., n. 57/73.

1528

IN THE DISTRICT COURT OF THE STATE OF OREGON FOR LANE COUNTY

STATE OF OREGON · )
 ) ss. **SEARCH WARRANT**
County of Lane )

IN THE NAME OF THE STATE OF OREGON

To any police officer, greeting:

Information on oath having this day been laid before me that evidence of the crime of murder, to wit: the contents of an audio cassette recording of the confession made by Conan Wayne Hale to Father Mockaitis located at the Lane County District Attorney's Office at 125 East 8th Avenue, Eugene, Lane County, Oregon.

you are therefore hereby commanded to search the above described audio cassette tape for the above described evidence.

and if you find the same, or any part thereof, to return this warrant and an inventory of items seized to me at my office in the Lane County Courthouse, Eugene, Oregon, no later than five (5) days following execution of this warrant.

[X] This warrant to be executed between 7:00 a.m. and 10:00 p.m.

( ) This warrant to be executed at any time day or night.

Dated this __23rd__ day of April, 1996, at __11:35a__.m.

_____
DISTRICT COURT JUDGE

**EXHIBIT BB**
**PAGE 2 of 13**

# EVIDENCE/PROPER

Lane County Sheriff's Office

Page 1 of 1

2 Case No. 95-956C

| DA | TALLY | PRESS | WSP | CIS | PAROL/SGT | HATE/CRIME |
|---|---|---|---|---|---|---|
| CSD | JUV | UEU | MTL/NEAL | OLCC | CHU | GANG |
| EPD | | | | | | |
| SPD | | | | | | |
| OSP | | | | | | |

RELATED REPORTS
- Accident
- Incident
- Citation
- Custody
- Prop/Evidence
- Supplemental

Property Want Check

Incident or No. HOMICIDE
Incident Location MCGOWON CREEK RD. MARCOLA

| AIRS | LEDS | NCIC | 4 Reported Date 12-31-95 | 6. Time | 6. Impd. Date | 7. Time |
|---|---|---|---|---|---|---|

**EVIDENCE**

8
- Destroy
- Hold for Court
- Hold for Lab
- Print Pictures
- Fingerprint
- Hold for Owner

9 Instructions for Processing (list item no's)

10 Test for Cont: Substance C | 11 Suspected Content | 12 Towed From

**TOWED VEHICLE**

13 Recovered Stolen Vehicle
- LCSC Case
Other Agency

14 TOWED VEHICLE INFO
- Custody
- Accident
- Evidence Hold
- Abandoned Vehicle
- Seized Asset/Forfeiture
- Hazard

15 Towed By | 16 Towed To
17. Cd No | 18 Tow Operator Signature

EV: ARS LEDS NCIC REG | O: AIRS LEDS NCIC REG | 19 VIN No. | 20 Color (Top/Bottom) | 21. Odometer

| 22 LIC NO | State | Exp Yr | Veh Yr | Make | Model | Style | 23. Notified Date/Time | Value |
|---|---|---|---|---|---|---|---|---|

**PERSONS**

24 Name HALE (EVAN) W.
26 Address | City | State | Zip | AIRS No | 25 DOB | 27 Phone

25 Name | First | Middle | AIRS No | 29 DOB
30 Address | City | State | Zip | 31 Phone

32.
- Keys in Veh.
- Not Driveable
- Radio
- Stereo Tape
- CB Radio
- Spec. Ant.
- Cust. Wheels
- Right Damage
- Left Damage
- Front Damage
- Rear Damage
- Stripped
- Trunk Exam
- Prop. Remo.

| NC | QTY | 33 ITEM | 34 SER NO/INSCR | 35 BRAND | 36 MODEL/SIZE/COLOR | 37 VALUE |
|---|---|---|---|---|---|---|
| R-11 | 1 | AUDIO CASSETTE OF (CONVERSATION) BETWEEN HALE AND LATHER MOCKAITIS AT LANE COUNTY JAIL VISITING | | | | |

**INVENTORY LISTING □**

**RECOVERED STOLEN PROPERTY □**

38 Recovering Officer | 1 Cd No | 39 Date 7/25/96 | 40 Time | 41. Released
42 Released Other Spec | 43 Released To (Signature)

1530

AT ./*11:48*..O'CLOCK./*A*....M

APR 2 3 1996

Circuit/District Courts
For Lane County, Oregon
BY *G. Williams*

IN THE DISTRICT COURT OF THE STATE OF OREGON FOR LANE COUNTY

STATE OF OREGON )
 ) ss. **SEARCH WARRANT**

County of Lane )

IN THE NAME OF THE STATE OF OREGON

To any police officer, greeting.

Information on oath having this day been laid before me that evidence of the crime of murder, to wit: the contents of an audio cassette recording of the confession made by Conan Wayne Hale to Father Mockaitis located at the Lane County District Attorney's Office at 125 East 8th Avenue, Eugene, Lane County, Oregon.

you are therefore hereby commanded to search the above described audio cassette tape for the above described evidence.

and if you find the same, or any part thereof, to return this warrant and an inventory of items seized to me at my office in the Lane County Courthouse, Eugene, Oregon, no later than five (5) days following execution of this warrant.

(X) This warrant to be executed between 7:00 a.m. and 10:00 p.m.

( ) This warrant to be executed at any time day or night.

Dated this 23rd day of April, 1996, at *11:359* .m.

_____
DISTRICT COURT JUDGE

EXHIBIT BB
PAGES 4-6 of 13

IN THE DISTRICT COURT OF THE STATE OF OREGON FOR LANE COUNTY

STATE OF OREGON )
 ) SS. AFFIDAVIT FOR SEARCH WARRANT
COUNTY OF LANE )

I, Jeffrey James Carley, being first duly sworn on oath, hereby depose and say, that:

I am a detective with the Lane County Sheriff's Office and have been employed in law enforcement for 18 years.

I have been assigned to investigate the murder of three individuals who were killed on or about December 21, 1995 in Lane County, Oregon, on a logging landing near McGowan Creek. Jonathan Wayne Susbauer has been indicted for those murders and other related crimes in Lane County Circuit Court Case No. 10-96-00479. Conan Wayne Hale has been identified as a suspect in the murders and is being held at the Lane County Adult Corrections Facility on burglary and theft charges in Lane County Circuit Court Case No. 10-96-00478.

Attached as exhibit A is a copy of an affidavit and search warrant related to this case authorized by Judge Hodges of the Lane County District Court on December 26, 1995 and executed on December 27, 1995. That affidavit outlines the factual background of this investigation.

I interviewed Conan Wayne Hale on December 27, 1995, after the time of the affidavit in exhibit A. Conan Hale has told me that he was at the logging landing when the three victims were killed. He admitted hitting the two males with a baseball bat but denied firing the .38 revolver which killed them. I have reviewed the medical examiner's report and there is no physical evidence to corroborate Conan Hale's statement that he hit the males with the baseball bat. Conan Hale's DNA sample did not match the DNA recovered from Kristal Bendele's body and clothing. Conan Hale has admitted his involvement in the two burglaries and the thefts

described in exhibit A.

Conan Wayne Hale has been lodged at the Lane County Adult Corrections Facility since December 27, 1995 except for times he was transported to Marion County on other charges. During Conan Hale's stay at the Lane County Adult Corrections Facility his phone calls and visits have been recorded pursuant to ORS 165.540(2)(a). I have reviewed many of the audio cassette tapes of those visits and phone calls. Conan Hale is aware that his visits are being recorded. He has demonstrated his awareness that visits are recorded by holding up signs that communicate information to the visiting party and advising that person not to repeat the information over the phone. *My review of these tape was prior to April 22, 1996, in which Hale demonstrated his awareness that conversations were being recorded.*

I learned from Sgt. Bud Spencer, supervisor at the Lane County Adult Corrections Facility, that on or before April 18, 1996 Conan Wayne Hale made arrangements to have a Catholic priest visit him on April 22, 1996 for the purpose of making a confession. On April 22, 1996 at 9:35 a.m. Conan Hale met with Father Mockaitis of St. Paul's Catholic Church in the visiting booths at the jail. That conversation was conducted via phone between the two rooms separated by glass. The conversation was recorded on an audio cassette tape per usual practice and was delivered to me by jail personnel who retrieved it from the recording machine. The tape is currently in the custody of the District Attorney's office where it is sealed and secured.

I know from my experience and training that the Catholic confession is an integral part of Catholicism. It is a sacrament. The basic tenet of confession is that a person is absolved of his or her wrongdoing upon making a full and complete acknowledgment of what that wrongdoing is. After the person gives that acknowledgment of what he or she has done wrong, the priest prescribes a penance. Upon performance of the penance, a person is absolved of his or her sins.

Based on the aforesaid information, your affiant has probable cause to believe, and does believe, that evidence of the crime of murder, to wit: a statement by Conan Wayne Hale can

be seized from an audio tape located in the office of the Lane County District Attorney, 125 East 8th Avenue, Eugene, Oregon.

Wherefore, your affiant respectfully requests the court to review this affidavit in its entirety, and issue a search warrant to search the above described audio tape for·the above described evidence.

Jeffrey James Carley

Subscribed and sworn to before me this 23rd day of April, 1996 at /I: 354 .m.

DISTRICT COURT JUDGE

---

EXHIBIT BB

PAGES 7–13 of 13

IN THE DISTRICT COURT OF
THE STATE OF OREGON
FOR LANE COUNTY

STATE OF OREGON )
 ) SS.
COUNTY OF LANE )

**AFFIDAVIT FOR SEARCH WARRANT**

I, Dennis A. Williams, being first duly sworn on oath, do hereby depose and say:

That I am a Detective with the Eugene Police Department and have been employed in law enforcement for over 24 years. That I am presently assigned to the Property Crimes Unit of the Eugene Police Department to investigate property crimes, including theft and burglary.

That during the course of my duties I became aware of a burglary that occurred at 3676 Wilshire, Eugene, Lane County, Oregon. That this burglary occurred on December 14, 1995 and is documented under Eugene Police case report 95–24642. A copy of the police report is attached to this affidavit and incorporated herein in its entirety and referred to hereafter as exhibit "A".

That on December 23, 1995, I was informed by Eugene Police Detective Kathryn Flynn of the following: That while conducting a follow up investigation of this burglary she discovered Conan Wayne Hale had sold sixty-four compact discs to AA Ace Buyers, 3697 Franklin Boulevard, Eugene, Lane County, Oregon, on December 14, 1995, at 11:58 a.m. That she contacted Oren Silas Peterson, an employee of AA Ace Buyers at 3697 Franklin Boulevard, Eugene, Lane County, Oregon, regarding person(s) selling items from this burglary including Compact Discs whose titles were provided by the victim and are included in a supplemental report which is attached to this affidavit and referred to hereafter as Exhibit "B".

That Peterson told Detective Flynn he remembered the subject coming into the store with the involved compact discs in an athletic bag and selling them. That Peterson said he identified the subject using an Oregon driver's license and the photo on the license matched the person selling the compact discs. That the Oregon driver's license number matches that of Conan Wayne Hale, listing an address of 4283 E. 20th Avenue, Eugene, Lane County, Oregon. That the person signed the Secondhand Dealer Report slip number 156526 with the name Conan Wayne Hale.

That on December 24, 1995, members of the Lane County Sheriff's office and the

Eugene Police Department served a search warrant on the residence of Jonathan Wayne Susbauer searching for items related to this burglary. A number of items from this burglary were recovered in Jonathan Wayne Susbauer's residence. Mr. Susbauer was interviewed by police officers after the items were recovered and I heard Jonathan Wayne Susbauer admit that he and Conan Wayne Hale were responsible for committing the burglary of the above described residence. I have reviewed the police report listing stolen property related to the above related case and have identified property seized from Mr. Susbauer related to this burglary. This document is attached hereto and incorporated by this reference as Exhibit "C". Items on the attached list which are not marked as recovered remain outstanding and have not been recovered.

Further, on December 19, 1995, there was a burglary that occurred at 1268 Brookside, Eugene, Lane County, Oregon. Details of this burglary are documented in Eugene Police Department Case Number 95–24964. A copy of this report is attached hereto and incorporated by this reference herein as Exhibit "D". In the interview conducted with Jonathan Wayne Susbauer on December 24, 1995, Mr. Susbauer identified Conan Wayne Hale as helping participate in the Burglary. That in this burglary, sports memorabilia was stolen including a football helmet and football collectors cards.

That the football helmet stolen in this burglary was sold by Jonathan Wayne Susbauer on December 19, 1995. The sale of the helmet was witnessed by Jon Richard Dugdale from Action City Sportscards at Valley River Center. On December 23, 1995 I displayed a photo lineup to Mr. Dugdale which contained a picture of Jonathan Wayne Susbauer. He identified a picture of Mr. Susbauer in the lineup saying "he really looks like the guy." Earlier in the same day football collector cards were sold to the same business. In that transaction, the seller identified himself by a Oregon Drivers license with the name of Conan Wayne Hale, and that the picture on the license matched the person making the sale. The person who purchased the football cards was John Quincy Adams, the owner of

the business. Mr. Adams was unable to identify Conan Wayne Hale from a photo lineup that I prepared. However, Mr. Dugdale told me that the person who was present when he purchased the football helmet from Mr. Susbauer was the same person that had sold the football cards earlier in the day. Jonathan W. Susbauer stated that he was with Conan Wayne Hale during the incident when Conan Wayne Hale sold football cards from the 1268 Brookside burglary in the incident described by Mr. Adams.

In a related incident, I was assigned to assist in an investigation involving the murder of three youths, Brandon M. Williams, Kristal R. Bendele, and Patrick M. Finley, which occurred during the late evening hours of December 20, 1995 or the early morning hours of December 21, 1995.

In connection with this investigation I have spoken to Lane County Sheriff's Deputies, other Eugene Police Detectives, Oregon State Police officers and District Attorney Investigator Tom Yates. I have learned from investigative team briefings and specifically from Sgt Earl McMullen, Lane County Sheriff's office, that one of the victim's of the murder was Patrick M. Finley. That when Patrick Finley's body was discovered in a remote area near McGowan Creek that he was wearing a coat from the burglary which occurred on December 19, 1995 at 1268 Brookside Drive, Eugene, Lane County, Oregon. Additionally, that the bullets which caused the death of Brandon M. Williams and Kristal R. Bendele appear to be .38 cal semi wadcutter bullets. A .38 cal pistol was stolen in the burglary at 1268 Brookside, Eugene, Oregon. Additionally, a quantity of ammunition was stolen which has been subsequently described by the victim to be hand loaded semi wadcutter ammunition contained in a green plastic container.

In connection with the investigation of the murders of these individuals, a person identified as Michael Black, has informed Lane County Sheriff's detectives that he observed Brandon Williams, Kristal Bendele and Patrick Finley, enter a Suburban truck about 11:30 p.m. on the night of December 20, 1995. That Conan Wayne Hale was a person who

was riding in the truck and invited the three victims to get into the truck at that time.

I have been told by Tom Yates and Jeff Carley, LCSO detective, that Jonathan Wayne Susbauer has admitted to being the driver of the suburban truck during this incident, and that after the three persons were picked up by Conan Wayne Hale and himself, that the five of them drove to a remote area near McGowen Creek and that while at that location, both he and Conan Wayne Hale participated in killing the three individuals. That during the incident, Conan Wayne Hale was wearing a black trench coat and brown leather gloves. That the weapon used to kill the three victims was a .38 cal pistol that was taken in the burglary at 1268 Brookside along with football collectors cards and a football helmet. That he and Conan Wayne Hale sold items in this burglary at Action City Sportcards in the incident described above.

Jonathan Wayne Susbauer stated that during the shooting of the three victims a number of rounds of ammunition were fired by himself and Conan Wayne Hale from the .38 cal pistol. Mr. Susbauer believed the number to be 11. That during the incident the three victims were required to disrobe before they were shot. That at one point a rabbit fur jacket taken from 1268 Brookside was removed from the vehicle and ultimately was left at the scene of the murder. I learned from Sgt. McMullen that when Patrick Finley was discovered, he was wearing the rabbit fur jacket identified as coming from the 1268 Brookside burglary. A receipt with the victim's name was located in the pocket of the coat.

Jonathan Wayne Susbauer told Detectives Yates and Carley that Conan Wayne Hale had engaged in numerous sexual acts with Kristal Bendele prior to her death. Further, that Susbauer had fondled her breasts and buttocks but that he had not had sexual intercourse with Kristal Bendele.

Jonathan Wayne Susbauer told Detectives Yates and Carley that he and Conan Wayne Hale had placed the clothing, floormats and garbage from the suburban into plastic garbage sacks and that the two individuals planned for Hale to dispose of the sacks and Susbauer to dispose of the .38 cal pistol.

Jonathan Wayne Susbauer told Detectives Yates and Carley that Conan Wayne Hale told him that Hale had buried the expended cartridges from the .38 pistol near a doghouse in the back yard of Conan Wayne Hale's residence at 4283 E. 20th Avenue in Eugene, Lane County, Oregon. Further, that the plastic garbage sacks containing articles from the crime scene and Suburban, a machete, and baseball bat, yellow and red in color, the black trench coat and brown leather gloves used by Conan Wayne Hale during the incident, were last seen by Jonathan Wayne Susbauer on Friday December 22, 1995, at the Hale residence.

In connection with this investigation, a search of Jonathan Wayne Susbauer's residence occurred pursuant to a search warrant and football cards and a suitcase listed as being stolen in the above mentioned burglary were recovered. The .38 cal pistol was recovered later at the same residence. Items not recovered from the 1268 Brookside burglary include a navy blue fleece liner to a jacket and a University of Oregon baseball cap with a tan bill. These items were not listed in the police report taken in connection with the burglary, but this information has been related to me by the victims of the burglary. Additionally, the rabbit fur jacket worn by Patrick Finley was also identified as coming from the 1268 Brookside burglary by the victim in a subsequent interview.

I know now from police computer records listed in the Area Information Records System (AIRS) that Conan Hale lists an address of 4283 E. 20th Avenue in Eugene, Lane County, Oregon.

On December 24, 1995, the Suburban vehicle was located with the assistance of Jonathan Susbauer. That vehicle was impounded at the Oregon State Police Crime Lab. A search warrant was obtained and executed on the Suburban vehicle on December 25, 1995. Two of the seat belts had been cut, the ashtrays, lighter and floor mats had been removed.

On December 26, 1995, a search warrant was executed at the residence of Conan

Wayne Hale. Located at the residence were two seat belts, two ashtrays and a lighter that are consistent with those missing from the Suburban. The search is continuing and items not recovered include .38 cal casings, clothing in garbage bags and some items from the Wilshire and Brookside burglaries.

On December 26, 1995, I received information from Springfield Police Detective John Umenhofer that Conan Wayne Hale had been seen with a .38 cal revolver after the time of the murders. The description of this gun is consistent with the one seized by police from Jon Susbauer.

Criminalist Gordon Rutter of the Oregon State Police has tested .38 caliber slugs found at the crime scene and determined that they were fired from the .38 cal revolver seized by police and which has been identified as the gun taken in the 1268 Brookside burglary.

Criminalist Bradford Putnam of the Oregon State Police has processed the vaginal and rectal swabs taken from Kristal Bendele at her autopsy. The samples tested positive for seminal fluid.

I know from my training and experience that seminal fluid samples of an unknown origin such as those retrieved from the vagina and rectum of Kristal Bendele can be compared with blood, oral swab and saliva exemplars of a known origin by a qualified criminalist and an expert opinion rendered whether they are from the same or different sources. Such an opinion would provide relevant and probative evidence concerning the identity of the person or persons having engaged in sexual activity with Kristal Bendele.

Further, I know that there is a medical facility available at the Lane County Adult Corrections Facility for the procurement of the requested exemplars and a duly qualified person will take the exemplars in a medically suitable fashion.

Based on the aforesaid information, your affiant has probable cause to believe, and does believe, that evidence of the crimes of rape, sodomy, sexual abuse, murder and aggravated murder to wit, blood, saliva exemplars and oral swabs can be found in the person of Conan Wayne Hale, dob 12/28/75, described as a white male, 5'10" tall, 190 lbs, brown hair, with hazel eyes and can be seized at the above described facility.

Efforts have been made in the last 24 hours to locate Conan Wayne Hale without success. His mother, Katie Long Brown, has indicated that he is in hiding. Efforts to locate Hale include going to his residence and contacting all known relatives and associates. It is unknown when Conan Wayne Hale will be located. Therefore, I am requesting authorization to execute this search warrant at any time of the day or night.

THEREFORE, your affiant respectfully requests the court review this affidavit in its entirety, and issue a search warrant to seize the above described person for such time as is required to obtain the exemplars and search him for the above described evidence.

/s/ Dennis A. Williams
DENNIS A. WILLIAMS

Subscribed and sworn to before me this 26th day of Dec., 1995, at 8:47 P.M.

/s/ Bryan T. Hodges
DISTRICT COURT JUDGE

EXHIBIT CC
PAGE 1 of 2

**ARCHDIOCESE
OF PORTLAND
IN OREGON**

*Office of Archdiocesan Administrator*

May 21, 1996

F. Douglass Harcleroad, Esq.
Lane County District Attorney
Lane County District Attorney's Office
125 E. 8th Avenue
Eugene, OR 97401

Dear Mr. Harcleroad:

As the Administrator of the Archdiocese of Portland, I act in all matters related to the Catholic Church in Western Oregon. That responsibility includes insuring the integrity of our sacraments, including the Sacrament of Penance.

Catholics believe, that as a consequence of the death and resurrection of Jesus Christ, divine forgiveness is mediated sacramentally through the Church. A sacrament is a visible means instituted by Christ communicating the power of God. Among the sacraments of the Church, the Sacrament of Penance is a privileged moment of reconciliation. For Catholics, sin is above all an offense against God and a rupture of right relationship with Him and our neighbor. When an individual has sinned they are compelled to seek forgiveness and reconciliation through the Sacrament of Penance.

The obligation to keep secret anything known through the Sacrament of Penance is an intrinsic element of the Sacrament and a binding obligation of our Catholic faith. Canon 983 of the Code of Canon Law evidences the Sacrament's inviolability by forbidding a priest to betray a penitent by any means for any reason whatsoever. A confessor who knowingly violates the confidentiality of the Sacrament incurs the penalty of automatic excommunication.

A Catholic who violates the Sacrament by recording it or taking part in such a recording has ruptured their relationship with the Church. The integrity of the Sacrament must remain absolute. As a citizen as well as a bishop I believe that the April 22, 1996 tape-recording is not only a sacramental desecration but an impediment to the free exercise of our religion.

EXHIBIT CC
PAGE 2 of 2

The existence of a record of the Sacrament of Penance constitutes a living violation. The tape-recording of the Sacrament administered by Fr. Mockaitis to Conan Hale is not a past event but a present, ongoing sacramental transgression. As a bishop I have an obligation to end that continuing violation.

On May 7, 1996 you met with representatives of the Archdiocese. Through them I requested the destruction of the tape and a guarantee of the confidentiality of the Sacrament. During the intervening weeks, I hope that the seriousness of the situation has manifested itself. Believing that considered reflection shows the validity of my request, I ask that you meet with Fr. Michael Maslowsky and other Archdiocesan representatives on June 4, 1996 in an attempt to properly resolve this situation.

Sincerely yours in Christ,

Bishop Kenneth Steiner
Archdiocesan Administrator

EXHIBIT DD

FILED
AT____O'CLOCK____M
MAY 2 2 1996

Court Administrator
Circuit/Dist. Court for Lane Co. Oregon
By /S/ JEAN BENNETT

IN THE CIRCUIT COURT FOR THE STATE OF OREGON FOR LANE COUNTY

| | |
|---|---|
| In the Matter of ) | |
| ) | AMENDED |
| A TAPE RECORDING OF CONAN ) | MOTION AND ORDER |
| WAYNE HALE MADE AT THE LANE ) | |
| COUNTY JAIL ON APRIL 22, 1996. ) | |

COMES NOW the State of Oregon by and through F. Douglass Harcleroad, District Attorney for Lane County, and moves the Court to retain and seal the tape marked Exhibit 1 and transcript marked Exhibit 2 containing eleven (11) pages tendered hereby until further order of the Court. Exhibits 1 and 2 are the originals and have not been copied. Further, the State requests that the Court order all persons with knowledge of the contents of this tape recording and transcript not to disclose the contents without further order of the Court.

DATED this 22nd day of May, 1996.

F. Douglass Harcleroad, OSB #73120
Lane County District Attorney

ORDER

IT IS SO ORDERED.

DATED this 22 day of May, 1996.

EXHIBIT EE

## IN THE CIRCUIT COURT OF THE STATE OF OREGON FOR LANE COUNTY

In the Matter of

A Tape Recording of Conan Wayne Hale Made at the Lane County Jail on April 22, 1996

No. ———

PETITION AND MOTION OF THE REVEREND TIMOTHY MOCKAITIS AND THE MOST REVEREND FRANCIS E. GEORGE FOR DESTRUCTION OF TAPE AND TRANSCRIPT

(Oral Argument Requested)

The Reverend Timothy Mockaitis ("Fr. Mockaitis"), for himself, and the Most Reverend Francis E. George, O.M.I. ("Archbishop George"), as the Roman Catholic Archbishop of Portland in Oregon, move for an order that the tape and transcript delivered to the Court by F. Douglass Harcleroad, District Attorney for Lane County, and sealed by this Court's order dated May 22, 1996, be destroyed, and further, that the Court continue its order that all persons with knowledge of the contents of the tape and transcript not disclose its contents. For support of their motion, Fr. Mockaitis and Archbishop George rely upon the appended affidavits of the Reverend Timothy Mockaitis and the Reverend Michael Maslowsky, and the following points and authorities.

### SUMMARY

Destruction of the tape and transcript and continuance of the Court's order of non-disclosure are necessary remedies for the violation of the constitutional rights to the free exercise of religion of Fr. Mockaitis and the body of the Catholic Church. Those rights of religious freedom were, and continue to be, violated by the surreptitious taping of the Sacrament of Penance administered by Fr. Mockaitis in the Lane County Jail on April 22, 1996. The provisions of the First and

Fourteenth Amendments to the Constitution of the United States as well as Sections 2 and 3 of Article I of the Bill of Rights to the Oregon Constitution, require the destruction of the tape and transcript.

This Court is empowered to take this action by Article VII, Section 1, and Article I, Section 10 of the Oregon Constitution, ORS 1.010(5), ORS 1.160, the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*, the Civil Rights Act, 42 U.S.C. § 1983, and other statutes described below. The Honorable Kip W. Leonard is empowered to hear this motion pursuant to ORS 1.171 as the presiding judge of Lane County Circuit Court and as the judge who entered the initial order of May 22, 1996.

The moving parties have provided copies of this motion and supporting affidavits to F. Douglass Harcleroad, Lane County District Attorney, and to the attorneys of record for Conan Wayne Hale and Jonathan Wayne Susbauer.

### POINTS AND AUTHORITIES

I. *Summary of Facts.*

The appended affidavits and other materials establish the following facts. As of April 22, 1996, Conan Wayne Hale was a resident of the Lane County Adult Corrections Facility (the "Jail") on burglary and theft charges in Lane County Circuit Court Case No. 10–96–00478. He was a suspect in the homicide of three individuals, which homicide occurred on or about December 21, 1995. Jonathan Wayne Susbauer had been indicted previously for these homicides and other related crimes, in Lane County Circuit Court Case No. 10–96–00479.

Jeffrey J. Carley was one of the detectives of the Lane County Sheriff's Office assigned to investigate the crimes described above. In his affidavit of April 23, 1996 (a copy of which is included in Ex. AA),[1] Detective Carley testified that Hale admitted he was present at the area where the three victims were killed, but denied discharging the handgun

---

1. The Court may take judicial notice of the affidavit pursuant to Oregon Rule of Evidence 201(b) (ORS 40.065) because that affidavit is in this Court's own files.

which killed the three victims. Ex. AA (Carley Aff.).

Detective Carley became aware that "Conan Wayne Hale made arrangements to have a Catholic priest visit him on April 22, 1996 for the purpose of making a confession." Ex. AA (Carley Aff.). In his affidavit, Detective Carley testified about his knowledge of the Sacrament of Penance (also called "Confession") as follows:

> I know from my experience and training that the Catholic confession is an integral part of Catholicism. It is a sacrament.

Ex. AA (Carley Aff.).

With knowledge of the exclusively religious purpose of the visit by the Catholic priest, the governmental authorities involved recorded the Sacramental of Penance administered by Fr. Mockaitis to Conan Wayne Hale at the Jail on April 22, 1996. The moving parties are informed that the only copy of the audiotape and the only transcript of the Sacrament of Penance are now in the hands of this Court. Ex. BB, Court's Order Dated May 22, 1996 (attached as Ex. BB).

## II. *Applicable Law.*

Both state and federal law offer substantial protections to the free exercise of religion. The privacy of the Sacrament of Penance administered by Father Mockaitis is also protected by the Fourth Amendment to the United States Constitution and by Title III of the Omnibus Crime Control and Safe Streets Act of 1968. Destruction of the tape and transcript is an appropriate remedy for violations of the religious and other rights protected by these laws.

### A. *Federal Law Protects the Free Exercise of Religious Rights.*

Special protections for freedom of religion were adopted in the first section of the Bill of Rights to the United States Constitution. The first portion of Amendment I to the Constitution of the United States provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . .

The free exercise clause of the First Amendment was made applicable to state action by incorporation into the Fourteenth Amendment. *Schneider v. State of New Jersey,* 308 U.S. 147, 160, 60 S.Ct. 146, 150 (1940).

An action for violation of the First Amendment right to free exercise of religion or any other constitutional violation may be brought under 42 U.S.C. § 1983. That statute provides, in pertinent part:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any state or territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any right, privileges, or immunities, secured by the constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Under this section, courts have broad powers to grant whatever equitable relief is necessary to redress a deprivation of constitutional rights. *See, e.g., Lodestar Co. v. County of Mono,* 639 F.Supp. 1439, 1446 (E.D.Cal.1986) (citations omitted); *Carvalho v. Coletta dba East Side Arco,* 457 A.2d 614, 617 (Rhode Island 1983).

The free exercise of religion is also protected by the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.* Among the purposes of the Religious Freedom Restoration Act are to

> ... provide a claim or defense to persons whose religious exercise is substantially burdened by government.

42 U.S.C. § 2000bb(b)(2). The Act further provides that:

> Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability except as provided in subsection (b) of this section.
>
> (b) Government may substantially burden a person's exercise of religion only if it demonstrates that the application of the burden to the person—
>
> (1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000bb–1. The Act's remedial provisions are broad:

A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government.

The First Amendment and the Religious Freedom Restoration Act protect the free exercise of religion by Fr. Mockaitis and other priests who might seek to carry out their religious duty to perform the Sacrament of Penance at the Lane County Jail or elsewhere.

### B. Federal Law Prohibits the Seizure of the Priest–Penitent Communications.

The Fourth Amendment to the United States Constitution provides, in pertinent part:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . .

The protection offered by the Fourth Amendment extends to private conversations. *Katz v. United States,* 389 U.S. 347, 352, 88 SCt 507, 512 (1967). The United States Supreme Court has stated that the return or destruction of property seized in violation of the Fourth Amendment may provide an effective remedy for the constitutional violation. *Church of Scientology of California v. United States and Frank S. Zolin,* 506 U.S. 9, 12–13, 113 S.Ct. 447 (1992).

Based in part on the Supreme Court's Fourth Amendment jurisprudence, Title III of the Omnibus Crime Control and Safe Streets Act of 1968 prohibits the intentional interception of wire, oral or electronic communication in the absence of a court order. 18 U.S.C. §§ 2510–2520. The protections of Title III extend to the conversations of inmates over institutional telephones. *See Campiti v. Walonis,* 611 F.2d 387, 392–93 (1st Cir.1979).

Although Title III exempts from its prohibition communications intercepted by corrections officers in the "ordinary course" of their duties, an interception intended to gather evidence in a criminal case is not in the "ordinary course" of a correctional officer's duties and therefore violates Title III. *Campiti v. Walonis, supra,* 611 F.2d at 390, 392. Further, while the Lane County District Attorney's office purported to obtain a search warrant to listen to the tape *after* it was made, the initial interception, monitoring and taping of Fr. Mockaitis' administration of the Sacrament of Penance was *not* accomplished pursuant to court order. *See* Ex. AA (Carley Aff.).

### C. Oregon Law Protects the Free Exercise of Religion.

When Oregon became a state, its founders placed in the opening portions of the Oregon Constitution, its Article I entitled "Bill of Rights," special protections for the practice of religion. Section 2 of Article I of the Constitution of Oregon provides:

All men shall be secure in the Natural right, to worship Almighty God according to the dictates of their own consciences.

Section 3 of the same Article provides:

No law shall in any case whatever control the free exercise, and enjoyment of religeous [sic] opinions, or interfere with the rights of conscience.

Sections 4, 5, and 6 of Article I also pertain to freedom of religion; those sections prohibit religious tests as a requirement for office, prevent the legislature from appropriating funds to support a theological institution, and prevent a religious test for jurors or witnesses.

Additionally, Oregon law provides a specific evidentiary privilege for communications such as the Sacrament administered by Fr. Mockaitis on April 22, 1996:

A member of the clergy shall not, without the consent of the person making the communication, be examined as to any confidential communication made to the member of the clergy and the members professional character.

ORE 506(2).[2] The 1981 Conference Committee Commentary to ORE 506 states:

> The privilege allows and encourages individuals to fulfill their religious, emotional or other needs by protecting confidential disclosures to religious practitioners.

### D. *The Court is Authorized Under Both State and Federal Law to Order Destruction of the Tape and Transcript.*

Article I, Section 10 of the Oregon Constitution provides that for every wrong a remedy shall exist: "... Every man shall have remedy by due course of law for injury done him in his person, property, or reputation." This section guarantees not only a remedy in name, but a "substantial" remedy. *Hale v. Port of Portland,* 308 Or. 508, 523, 783 P.2d 506 (1989).

The Oregon Constitution created courts to provide remedies for such injuries: "The judicial power of the state shall be vested in one supreme court and in such other courts as may be from time to time created by law." Oregon Constitution, Article VII, Section 1.

The Oregon legislature, in turn, has provided Oregon courts with broad powers to dispense justice as may be necessary to provide a substantial remedy to aggrieved individuals:

> When jurisdiction is, by the Constitution or by statute, conferred on a court or judicial officer, all the means to carry it into effect are also given; and in the exercise of the jurisdiction, if the course of proceeding is not specifically pointed out by the procedural statutes, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of the procedural statutes.

ORS 1.160.

That statute was enacted "in pursuance of" Article I, Section 10 of the Oregon Constitution, *Williams v. Pacific Surety,* 66 Or. 151, 155, 127 Pac 145 (1913), and leaves the court free to adopt procedures necessary to administer justice. *Id.*

The Oregon legislature has also granted courts broad authority over any matters, persons or parties before them: "Every court of justice has power: ... (5) to control, in furtherance in justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it, in every matter appertaining thereto." ORS 1.010.

The United States Supreme Court has expressly recognized that destruction of property is in certain instances an appropriate remedy for constitutional violations. In *Church of Scientology of California v. United States and Frank S. Zolin,* 506 U.S. 9, 113 S.Ct. 447 (1992), a state court clerk had possession of tape recordings of privileged conversations between Church officials and their attorneys. *Id.* at 10–11. The Internal Revenue Service obtained the tapes from the clerk pursuant to a summons. The Church then brought an action in federal court to compel the IRS to return the tapes, and the district court ordered the tapes returned to the state court clerk. *Id.* at 11. The IRS then filed a petition to enforce the summons it had previously served on the state court clerk, and the Church intervened, contending the tapes were protected by the attorney-client privilege. *Id.* Eventually, the District Court ordered the clerk to comply with the summons. *Id.* The Church argued unsuccessfully for a stay and appealed the order. *Id.* While the Church's appeal was pending, the tapes were delivered to the IRS. *Id.*

The Court of Appeals dismissed the Church's appeal as moot. *Id.* at 12. On petition for certiorari to the Supreme Court, the IRS argued that, since the tapes had been delivered to it prior to the time the case came before the Court of Appeals, it was "impossible for the Court of Appeals to grant the Church any effectual relief." *Id.*

The Supreme Court disagreed. *Id.* Writing for a unanimous court, Justice Stevens said the following:

> While a court may not be able to return the parties to the status quo ante—there is nothing a court can do to withdraw all knowledge or information that IRS agents may have acquired by examination of the tapes—a court can fashion some form of

---

**2.** ORS 40.260.

meaningful relief in circumstances such as these. Taxpayers have obvious possessory interest in their records. When the Government has obtained such materials as a result of an unlawful summons, that interest is violated and a court can effectuate relief by ordering the Government to return the records. Moreover, even if the Government retains only copies of the disputed materials, a taxpayer still suffers injury by the Government's continued possession of those materials, namely, the affront to the taxpayer's privacy. A person's interest in maintaining the privacy of his "papers and effects" is of sufficient importance to merit constitutional protection. * * * *Even though it is now too late to prevent, or to provide a fully satisfactory remedy for, the invasion of privacy that occurred when the IRS obtained the information on the tapes, a court does have power to effectuate a partial remedy by ordering the Government to destroy or return any and all copies it may have in its possession.* The availability of this possible remedy is sufficient to prevent this case from being moot.

*Id.* at 12–13. *See also United States v. Blank,* 261 F.Supp. 180, 184 (N.D.Ohio 1966) (ordering United States Marshal to destroy contraband unlawfully seized by IRS in tax investigation).

The reasoning of the United States Supreme Court in *Church of Scientology* provides compelling support for the remedy requested in this case.

III. *The United States and Oregon Constitutions Require Destruction of the Tape and Transcript to Remedy the Constitutional Violations.*

The moving parties have a vital interest in protecting their right to free exercise of religion and obtaining a remedy for the ongoing constitutional violations.

A. *The Sacrament of Penance is an Exercise of Religion.*

The affidavits herein establish that the Sacrament of Penance as administered by an ordained priest of the Roman Catholic Church is a Sacrament of that Church.

Roman Catholics believe that as a consequence of the death and resurrection of Jesus Christ, divine forgiveness is mediated sacramentally through the Church. Affidavit of the Rev. Michael Maslowsky, ¶ 11 ("Fr. Maslowsky Aff."). A Sacrament is a visible means instituted by Christ to communicate the power of God. *Id.* at ¶ 6. Each of the Sacraments is administered by an ordained priest of the Roman Catholic Church. *Id.* at ¶ 9.

The Sacrament of Penance derives from the words of Jesus Christ in Holy Scripture. In the Gospel of Matthew, Chapter 16, Verses 18–20, Christ told his disciples:

"... So now I say to you: You are Peter and on this rock I will build my Church. And the gates of the underworld can never hold out against it. I will give you the keys of the kingdom of heaven: whatever you bind on earth shall be considered bound in heaven; whatever you loose on earth shall be considered loosed in heaven."

The Jerusalem Bible, Reader's Edition, Doubleday & Company (1966). In the Gospel of John, Christ spoke to the Apostles as follows:

"... The disciples were filled with joy when they saw the Lord, and he said to them again, 'Peace be with you.

As the Father sent me, so am I sending you.'

After saying this he breathed on them and said:

'Receive the Holy Spirit. For those whose sins you forgive, they are forgiven; for those whose sins you retain, they are retained.'"

Gospel of John, Chapter 20, Verses 20–23. *Id.*

Among the Sacraments of the Church, the Sacrament of Penance is a privileged moment of forgiveness and reconciliation. Fr. Maslowsky Aff., ¶ 11. When an individual has sinned, that individual is compelled to seek forgiveness and reconciliation with God through the Sacrament of Penance. *Id.* By its very nature, it must be secure and confidential. *Id.*

The obligation to keep totally secret anything known through the Sacrament of Penance is a critical element to the Sacrament and it is a binding obligation of the Roman Catholic faith. *Id.* The Roman Catholic Church has an established internal religious law known as Canon Law. Canon 983 of the Code of Canon Law demonstrates the critical nature of the confidentiality of the Sacrament of Confession, by forbidding a priest to betray the penitent by any means *for any reason whatsoever.* Fr. Maslowsky Aff., ¶ 18. A confessor priest who knowingly violates the confidentiality of the Sacrament of Penance incurs the penalty of automatic excommunication, which means a complete division between the individual and the Church. *Id.*

The reason why the Church imposes its ultimate sanction (excommunication) on a priest who breaks the seal of the confessional is this:

> In the Sacrament of Penance the priest functions in the person of Christ. The priest hears the private confession in the place of Christ. It is above all Christ who encounters the penitent in that intimate moment where sin is confessed and forgiveness is mediated. Consequently, sacramental confession is not simply a form of human conversation or consultation but a most private encounter between an individual and their God. A priest, in celebrating the Sacrament of Penance, acts for Christ who continually seeks the lost and binds up the wounded.

> The priest, therefore, is a faceless sign and instrument of Christ's love and mercy. The confidentiality of the Sacrament is an absolute duty on the part of the priest as a representative of Christ who reconciles sinners without revealing their sin or holding their sins against them. For the priest

to reveal the contents of the penitent's confession would be for him to usurp the place of Christ.

Fr. Maslowsky Aff., ¶¶ 16–17.

### B. *Both the Priest and the Church have Free Exercise Interests.*

Certainly the confessing penitent engages in a religious exercise by confessing. But so does the priest in hearing the confession. Fr. Maslowsky Aff., ¶ 14; Affidavit of the Reverend Timothy Mockaitis, ¶ 7. One of the duties of an ordained priest is to stand in the stead of Christ in hearing the confession, determining the appropriate penance and granting absolution. Fr. Maslowsky Aff., ¶ 17. The priest is required to hear confessions in circumstances that will guarantee complete confidentiality. Fr. Maslowsky Aff., ¶ 17. The tape recording of this Sacrament has interfered with the priest's participation in the Sacrament; a communication intended for Christ is in the hands of Caesar.[3]

The Church likewise has an interest:

> The Sacraments, instituted by Christ and entrusted to the Church, stand out as the principal means by which the Catholic faith is expressed and strengthened, worship is rendered to God and the sanctification of humankind is effected. Sacraments are, therefore, intrinsic and essential to the life of the Catholic Church. They contribute in the highest degree to the Church's establishment, strengthening and manifestation. Consequently, priests and the Catholic faithful must employ all necessary diligence in their celebration (Canon 840).

> It is for the Church alone to determine what is necessary for the validity of a Sacrament. The ecclesial authority of the Church determines their lawful celebration. All Sacraments must be properly celebrated and by the appropriate minis-

---

**3.** "Next they sent to him some Pharisees and some Herodians to catch him out in what he said. These came and said to him, "Master, we know you are an honest man, that you are not afraid of anyone, because a man's rank means nothing to you, and that you teach the way of God in all honesty. Is it permissible to pay taxes to Ceasar or not? Should we pay, yes or no?" Seeing through their hypocrisy he said to them, "Why do you set this trap for me? Hand me a denarius and let me see it.' They handed him one and he said, 'Whose head is this? Whose name?' 'Ceasar's' they told him. Jesus said to them, "Give back to Ceasar what belongs to Ceasar—and to God what belongs to God.' This reply took them completely by surprise." Gospel of Mark, Chapter 12, Verses 13–17. The Jerusalem Bible, Reader's Edition, Doubleday & Company (1966).

ters. It is the ultimate responsibility of the bishop to insure that Sacraments are properly administered by a ordained minister through the essential words and actions.

Fr. Maslowsky Aff., ¶¶ 8–9.

It is obvious that a judicial condoning of *any* breach in the absolute secrecy of the confessional will discourage penitents in similar cases from seeking absolution through the Sacrament. That intimidation would interfere with the rights of members of the Church to engage in its Sacraments and in the religious duty of the Catholic clergy to administer the Sacraments of the Church to those members. Under Catholic doctrine, some sins deny the sinner eternal salvation after death unless those sins are properly confessed and absolved by a priest. Fr. Maslowsky Aff., ¶ 13. So, the interference by the intimidation herein goes to the very heart of the relationship between Catholics and God in a matter which in the eyes of Catholics is more important than life and death.

### C. *The Act of Confession does not Contravene any Law or Policy.*

This is not a case where the exercise of religious rights violates the law, like a case where animals or humans are sacrificed in the name of religion. No law is violated by the act of Sacramental confession. Indeed, as discussed above, Oregon law positively encourages and protects it. ORE 506 (ORS 40.260).

Nor does the Sacrament of Penance interfere with the administration of justice. The state is no worse off for allowing a confidential Sacrament of Penance. A sacramental confession to a priest does not screen out evidence that the state might otherwise have acquired; the Sacrament of Penance takes place only on the assumption of the penitent that it will be totally confidential and confers a privilege solely on a person who is not otherwise a witness.

In ORE 506 (ORS 40.260), the Oregon Legislature has weighed the competing interests of the confessional against the interests of civil and criminal litigants who may have an interest in the content of the confession. The legislature has conclusively given the greater weight to protecting this specific exercise of constitutional religious rights.

### D. *The Only Effective Remedy is Destruction.*

It is no answer simply to seal this tape and transcript.

First, the very presence of the sacramental exercise on tape and transcript intrudes on the absolute secrecy central to that Sacrament. The contents of this sacramental exercise are now not solely between Christ, the priest and the penitent. They are in a record that may speak to anyone with a tape player.

Second, nothing short of destruction can remove the chilling effect on Catholic penitents. If the court does not order destruction, every penitent will know there is no absolute secrecy in the confessional, and that the contents of the Sacrament may be subject to disclosure because of a subsequent court order, theft or inadvertence. This chilling effect will have its greatest impact on persons in the position of the penitent herein, and those other persons who may be most in need of the Sacrament.

The chilling effect interferes with the right of Fr. Mockaitis to administer the Sacrament to Catholics who might otherwise seek the Sacrament of Penance from him as Conan Wayne Hale did. The chilling effect also interferes with the right of the Church and its members to seek and be given absolutions necessary to preserve what Catholics view as their eternal association with Christ.

### E. *No Other Rights Prohibit the Destruction of the Tape and Transcript.*

The plain violation of the constitutional rights to freedom of religion and privacy of communications stands in stark contrast to the inadmissibility of any statement on the tape or transcript.

First, the sanctity of the priest-penitent communication is recognized as an overriding societal interest by both state and federal law. ORE 506 expressly protects priest-pen-

itent communications. Unlike certain other privileges (e.g., the physician-patient privilege in ORE 504–1), the priest-penitent privilege is subject to *no exceptions.*

The importance of the priest-penitent privilege established by laws like ORE 506 has been recognized by the United States Supreme Court. *Trammel v. United States,* 445 U.S. 40, 53, 100 S.Ct. 906, 913 (1980) ("The priest-penitent privilege recognizes the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return."). Congress too has recognized the importance of the priest-penitent privilege: when enacting Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Congress expressly provided that privileged communications within conversations intercepted pursuant to the Act do not lose their privileged character by virtue of the interception. 18 U.S.C. § 2517(4).[4]

Second, destruction of the tape and transcript would not violate ORS 135.815, the statute which governs the duty of a District Attorney to disclose to criminal defendants material within the possession or control of the District Attorney. Even if it is contended that any portion of ORS 135.815 might apply to require disclosure, the disclosure of the sacramental communication between Fr. Mockaitis and Conan Wayne Hale implicates the free exercise rights guaranteed by the United States Constitution and the Oregon Constitution. The right of free exercise of religion would be violated and impeded if ORS 135.815 or 135.825 were construed to require disclosure of the contents of the tape or transcript. This court has an obligation to construe state statutes so as to avoid constitutional violation. *NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 501, 99 S.Ct. 1313, 1319, 59 L.Ed.2d 533 (1979).

ORS 135.873 itself contemplates that disclosure may not be proper in every circumstance. In pertinent part, that statute provides:

Upon a showing of good cause, the court may at any time order that specified disclosures be denied, restricted or deferred, or make such other order as is appropriate.

ORS 135.873(1). The appended affidavits establish the requisite "good cause." The only "appropriate" order is for the destruction of the tape and transcript and continuation of the court's order that those persons with knowledge of the tape not reveal its contents.

### CONCLUSION

The surreptitious taping of this confession was an unconstitutional and illegal interference with the free exercise of religious rights by Fr. Mockaitis, the penitent and the Roman Catholic Church. The interference can be remedied only by destruction of the offending record and the continuance of the court's order prohibiting further disclosure of its contents.

DATED this 12th day of June, 1996.
Respectfully submitted,
SCHWABE, WILLIAMSON & WYATT
By: /s/ Thomas V. Dulcich
Thomas V. Dulcich, OSB # 80210
Bradley I. Nye, OSB # 92604
John R. Faust, Jr., OSB # 58024
Of Attorneys for Petitioners/Moving Parties

EXHIBIT FF

IN THE CIRCUIT COURT OF THE STATE OF OREGON FOR LANE COUNTY

In the matter of

A Tape Recording of Conan Wayne Hale Made at the Lane County Jail on April 22, 1996

State of Oregon

County of Multnomah

AFFIDAVIT OF REVEREND MICHAEL MASLOWSKY

I, Michael Maslowsky, being first duly sworn on oath, do depose and say as follows:

---

4. Congress specifically considered the priest-penitent privilege when enacting Title III. S.Rep. No. 1097, 90th Cong., 2d Sess., reprinted in 1968 U.S.Code Cong. & Admin.News 2112, 2189.

1. I am an ordained priest of the Roman Catholic Church. I was ordained August 28, 1987 at St. Mary's Cathedral in Portland, Oregon. I took my seminary education at the North American College in Rome, Italy between 1983 and 1987. In addition to my ordination and seminary work, my additional training in the field of theology is a License in Sacred Theology from the Gregorian University in Rome in 1990 and a Doctorate in Sacred Theology from the Gregorian University in Rome in 1995.

2. I serve in the Archdiocese of Portland in Oregon, which is a geographical region between the Oregon Coast, the Cascade Mountains and Washington and California borders. I serve under the direction of the Most Reverend Francis E. George, the Archbishop of the Archdiocese of Portland in Oregon.

3. The Roman Catholic Church is a religion whose beliefs are based upon the person and teaching of Jesus Christ. Catholics believe Jesus Christ to be the Son of God and the Redeemer of the world. Jesus Christ committed His truth and authority to the apostles to be transmitted through the Holy Spirit to their successors. Catholics understand their bishops to have succeeded the apostles as pastors of the Church. Within Canon Law bishops are the primary teachers of doctrine, priests of sacred worship and ministers of governance (Canon 375).

4. A diocesan bishop possesses all the authority, proper and immediate, to exercise his pastoral office. Chief among the ministries of the bishop is the responsibility to serve as the principal moderator, promotor and custodian of the whole liturgical life of the Church (Canon 835). Within the Canon Law of the Roman Catholic Church, Archbishop Francis George, the Archbishop of the Archdiocese of Portland in Oregon, is the representative of Christ, a successor to the apostles and the chief Catholic religious official among the Church in Western Oregon.

5. Archbishop George, like all Catholic bishops, is responsible for insuring that his priests and people have proper access to the institutions and Sacraments intended to foster their spiritual life (Canon 384). As the foremost dispenser of the mysteries of God, the bishop is responsible for insuring the proper celebration of the Sacraments.

6. It is the belief of the Catholic Church that Jesus Christ, the perfect and final expression of the power and mercy of God, now acts through the Sacraments. These Sacraments are perceptible signs instituted by Christ to make present His grace and power. They are understood by Catholics to be privileged encounters, mediated by the Church, between an individual and Christ.

7. Over the centuries the Church has discerned that there are seven specific Sacraments that sanctify individuals, build up the Body of Christ, and give worship to God. The proper dispensation of these Sacraments is the responsibility first and foremost of the bishop. In union with the bishop and as participants in the fullness of his priesthood, individual priests are subsequently commissioned by their bishop to administer the Sacraments.

8. The Sacraments, instituted by Christ and entrusted to the Church, stand out as the principal means by which the Catholic faith is expressed and strengthened, worship is rendered to God and the sanctification of humankind is effected. Sacraments are, therefore, intrinsic and essential to the life of the Catholic Church. They contribute in the highest degree to the Church's establishment, strengthening and manifestation. Consequently, priests and the Catholic faithful must employ all necessary diligence in their celebration (Canon 840).

9. It is for the Church alone to determine what is necessary for the validity of a Sacrament. The ecclesial authority of the Church determines their lawful celebration. All Sacraments must be properly celebrated and by the appropriate ministers. It is the ultimate responsibility of the bishop to insure that Sacraments are properly administered by a ordained minister through the essential words and actions.

10. The seven Sacraments recognized by the Catholic Church are: Baptism, Eucharist, the Sacrament of Penance (the Sacrament of Reconciliation), the Sacrament of

Confirmation, the Sacrament of Marriage, the Sacrament of Holy Orders (ordination of priests), and the Sacrament of the Anointing of the Sick.

11. Among the Sacraments of the Church, the Sacrament of Penance is a privileged moment of forgiveness and reconciliation. Catholics believe, as a consequence of the death and resurrection of Jesus Christ, that divine forgiveness is mediated sacramentally through the Church. The Lord Jesus Christ has willed that the Church continue, through the sacramental mediation of the Church, His mission of reconciliation and forgiveness. Catholics, received into new life in Christ through Baptism, are not automatically freed from the weakness of human nature nor from the inclination to sin. Knowing that humanity is fragile and prone to sin, Christ instituted the Sacrament of Penance for all who have fallen into sin. The Sacrament is the offer of a new possibility to recover grace and right relationship with God and neighbor.

12. Catholics understand sin to be above all, an offense against God, a rupture of the right relationship established with Him through Christ. Sin is also an offense against others, damaging multiple relationships. In the Sacrament of Penance, Catholics, being sorry for their sins and willing to reform themselves, confess them to a legitimate minister and obtain from God forgiveness of sins through the absolution imparted by the priest. A priest-confessor, however, is not the master of God's forgiveness but is merely its servant (Canon 959).

13. A Catholic who is in a state of grave sin is compelled by their faith to seek forgiveness and reconciliation with God through the Sacrament of Penance. Deliberate failure to do so jeopardizes the soul of the penitent. When an individual has come to realize their sin, experiences contrition for it and desires reconciliation through confession and satisfaction, they rightfully seek the Sacrament of Penance. Individual confession and absolution constitutes the only ordinary way by which a Catholic who is aware of their serious sin can be reconciled with God and with the Church. Only physical or moral impossibility excuses a Catholic from confession within the Sacrament of Penance (Canon 960).

14. Catholic priests are compelled when asked to hear the confession of the faithful who seek to receive that Sacrament. This is especially true for those persons who are incarcerated in correctional facilities, who may be in the state of grave or mortal sin. Therefore, the obligation of the Roman Catholic priest to come to correctional facilities to offer the Sacrament of Penance is an important religious duty.

15. For a Catholic to validly receive sacramental absolution through the Sacrament of Penance it is required that they not only be contrite and suitably disposed but that they confess individually the serious sins they have committed. Oral admission of specific sins is an integral element of the Sacrament.

16. In the Sacrament of Penance the priest functions in the person of Christ. The priest hears the private confession in the place of Christ. It is above all Christ who encounters the penitent in that intimate moment where sin is confessed and forgiveness is mediated. Consequently, sacramental confession is not simply a form of human conversation or consultation but a most private encounter between an individual and their God. A priest, in celebrating the Sacrament of Penance, acts for Christ who continually seeks the lost and binds up the wounded.

17. The priest, therefore, is a faceless sign and instrument of Christ's love and mercy. The confidentiality of the Sacrament is an absolute duty on the part of the priest as a representative of Christ who reconciles sinners without revealing their sin or holding their sins against them. For the priest to reveal the contents of the penitent's confession would be for him to usurp the place of Christ.

18. It is absolutely forbidden for a priest to betray a penitent either by words or by any other means for any reason whatsoever. The Sacrament's confidentiality is so sacrosanct that even the smallest point of knowledge derived from the Sacrament is considered to be privileged. The absoluteness of

this confidentiality is termed by the Church to be an inviolable "sacramental seal". A priest-confessor who directly violates the sacramental seal incurs the most severe penalty the Church can impose, that of automatic excommunication reserved to the Apostolic See in Rome alone.

19. Not only is the priest-confessor bound but so too are all others who in any way attain knowledge of a penitent's confession. Interpreters, bystanders who intentionally or accidentally overhear the penitent, any individual who comes to possess knowledge of the confession are all bound to secrecy by the obligation of the sacramental seal. The law of the seal admits of no excusation. No cause, however great, whatever the circumstances, will justify its violation. The seal is inviolable.

20. I have worked with various priests and lay persons who minister to persons incarcerated in correctional facilities throughout the State of Oregon. To my knowledge, none of them have encountered a sacramental violation similar to that involved in this matter, where the Sacrament of Penance administered by Father Mockaitis at the Lane County Jail was surreptitiously intercepted and recorded without knowledge of Father Mockaitis.

21. As a representative of the Most Reverend Francis E. George, Archbishop of the Archdiocese of Portland in Oregon, I ask this Court to destroy the tape and transcript it is currently holding under seal, and continue its order that any persons with knowledge of it do not in any way disclose that knowledge to any person at any time.

/s/ Michael Maslowsky

Michael Maslowsky

SUBSCRIBED AND SWORN TO before me this 11 day of June,

/s/ [signature]

Notary Public for Oregon

My Commission Expires: 8–18–97

EXHIBIT GG

### IN THE CIRCUIT COURT OF THE STATE OF OREGON FOR LANE COUNTY

In the Matter of

A Tape Recording of Conan Wayne Hale Made at the Lane County Jail on April 22, 1996

STATE OF OREGON )

 ) ss:

County of Multnomah )

### AFFIDAVIT OF REVEREND TIMOTHY MOCKAITIS

I, Timothy Mockaitis, being first duly sworn on oath, do depose and say as follows:

1. I am an ordained priest of the Roman Catholic Church. I was ordained on August 15, 1978 at St. Mary's Church in Pendleton, Oregon. I took my seminary training at Mt. Angel Seminary in Mt. Angel, Oregon. I am currently assigned as a pastor of St. Paul's Catholic Church in Eugene, Oregon.

2. From time to time since my appointment as pastor of St. Paul's Catholic Church, I have been called to the Lane County Jail to administer the Sacrament of Reconciliation. Prior to my first visit, I was required to produce to the personnel in the Lane County Jail a copy of a letter from then Archbishop William J. Levada authenticating my ordination as a priest, a photograph identification, and a copy of a record from the State of Oregon which registered me as qualified to perform marriages in this State. Each time I went to the jail to administer the Sacrament of Reconciliation I wore my Roman collar which identifies me as a priest of the Roman Catholic Church.

3. In April, 1996, I was asked to come to the Lane County Jail to administer the Sacrament of Reconciliation, also called the Sacrament of Penance and also referred to as "confession", to an inmate. I signed in as I normally do when visiting the jail for that purpose. At no time was I ever told that my sacramental duties would be overheard, intercepted, or recorded. If I would have been given such knowledge, I could not have car-

ried out my sacramental duties of administering the Sacrament of Penance. As a Catholic priest, I know and understand that the seal of the confessional requires absolute confidentiality. I cannot reveal any information related to that Sacramental encounter, on pain of excommunication from my church.

4. In the area where visitors sign in with Lane County jail personnel before entering the visiting area, a sign is posted with several standing orders. Among those orders is the phrase "recording equipment not allowed."

5. I had no knowledge of nor did I have any reason to believe that my sacramental encounter at the Lane County Jail on April 22, 1996, was being intercepted, overheard, or recorded. I learned about the existence of the tape when I received a telephone call from a reporter for the *Eugene Register-Guard*.

6. I met with Mr. Harcleroad in his office on May 7, 1996, when the request to destroy the tape was first made.

7. As long as any copy of a tape or transcript of the Sacrament of Penance I administered on April 22, 1996 remains in existence, I feel uncomfortable in administering the Sacrament of Penance (Reconciliation) in the Lane County Jail. My religious duties as a priest require me to respond to people who ask me to administer the Sacrament of Penance, even outside of the physical structure of our parish church building. This is especially important for people who may be in a state of serious sin and therefore in particular need of the Sacrament of Penance. It is critical for the free exercise of my religious beliefs and those who ask my priestly assistance in administering the Sacrament of Penance, that the Sacrament be carried out in a way which assures confidentiality. As long as the tape and transcript remain, I will have doubts about the ability of Catholics to practice this important Sacrament as it is meant to be performed.

8. I ask the court to destroy the tape and transcript. I further ask the court to extend its order preventing any persons with any knowledge of the contents of that tape and transcript to not reveal that knowledge to anyone at any time.

/s/ Rev. Timothy Mockaitis
 Reverend Timothy Mockaitis

SUBSCRIBED AND SWORN TO before me this 11th day of June, 1996.

[signature]
Notary Public for Oregon
My Commission Expires: 12/28/97

# EXHIBIT HH

C. COURT OF THE STATE OF OREC
FOR LANE COUNTY
LANE COUNTY COURTHOUSE
EUGENE OREGON 97401

JACK A BILLINGS
CIRCUIT JUDGE
687-4250

June 13, 1996

Thomas V. Dulcich
SCHWABE, WILLIAMSON & WYATT
Pacwest Center, Suites 1600-1800
1211 Southwest Fifth Avenue
Portland, OR 97204-3795

RF· State v Conan Wayne Hale
Case No. 10-96-04830

Dear Mr. Dulcich

The packet of papers which you submitted to the Court yesterday were routed to my chambers by the clerk's office, since it was not clear what should be done with them. To the extent that the Petition which you have submitted on behalf of the clergy attempts to intervene in the pending criminal case involving the above-named defendant, that is not permitted by law. ORS 131.025.

To the extent that the documents you have presented to the Court represent an effort to commence some separate proceeding, they do not state a justiciable controversy. They are, therefore, not suitable for filing Accordingly, I'm returning your papers to you, together with your filing fee

Finally, I enclose for your information a copy of an Order I have entered this date, upon the Motion of the above-named defendant, with the concurrence of the District Attorney, the parties to the criminal case Please be advised that except upon further motion of one or both of the parties, or upon directive of some higher court, this Court will not consider, under any circumstances, the action which your clients desire

Sincerely yours,

Jack A. Billings
Circuit Judge

JAB·kea
Enclosures
cc· Terri Wood
 Joe Kosydar

EXHIBIT II

FILED

AT .....O'CLOCK.....M

JUN 13 1996

Circuit/District Courts for Lane County Oregon
BY _____

## IN THE CIRCUIT COURT OF THE STATE OF OREGON FOR LANE COUNTY

STATE OF OREGON,

 PLAINTIFF,

·VS·

CONAN WAYNE HALE,

 DEFENDANT

CASE NO. 10·96·04830

ORDER

THIS CAUSE coming before the Court on Defendant's motion to preserve evidence, in which the State concurs, and the Court being fully advised in the premises

IT IS HEREBY ORDERED that all judicial officers and agents of the State who are now in possession or who may come into possession of a tape recording and transcript thereof of a conversation between Defendant and the Rev. Timothy Mockaitis which occurred on or about April 22, 1996 at the Lane County Jail, are to preserve those items as evidence in the above-styled cause during the pendency of these proceedings

DATED THIS __15__ DAY OF __June__. 1996.

_____
CIRCUIT COURT JUDGE